**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
www.flmb.uscourts.gov

In re:

Case No. 8:25-bk-06436-RCT

DAMON ANTHONY DASH,

Chapter 7

     Debtor.

_____/

**EMERGENCY[1] MOTION TO DETERMINE THAT**
**AUTOMATIC STAY DOES NOT APPLY, OR, IN THE**
**ALTERNATIVE, MOTION FOR RELIEF FROM AUTOMATIC STAY**

Creditors Josh Webber ("**Webber**"), Muddy Water Pictures, LLC d/b/a Muddy Water Pictures, Inc., ("**MWP**") and Christopher Brown ("**Brown**") (collectively, the "**Creditors**"), by and through undersigned counsel, hereby file this *Emergency Motion to Determine Automatic Stay Does Not Apply, or, in the Alternative, Motion for the Relief from Automatic Stay* ("**Emergency Motion**"), and in support thereof, state:

1.     The Debtor, Damon Dash (the "**Debtor**" or "**Dash**"), filed a voluntary Chapter 7 bankruptcy petition on September 4, 2025.

2.     Creditors obtained judgments against the Debtor and others prepetition in the following causes of action.

    i.     In the case styled *Webber, et al. v. Dash, et al.*, No. 1:2019-cv-00610 RWL (S.D.N.Y. 2022), a judgment was entered against the Debtor, Poppington LLC d/b/a Dame Dash Studios ("**Poppington**") jointly and severally as follows:

       a.   MWP received $30,000 in statutory damages for copyright infringement;

       b.   MWP received an award of $125,000.00, however, MWP's award was

---

[1] An auction has recently been set for December 30, 2025. This was previously filed as an Exigent Motion and is being refiled as an Emergency due to urgent timing needs.

reduced to $25,000.00 on *remitter*.

 c. Webber received an award of $400,000.00 in compensatory damages for defamation;

 d. Webber received an award of $250,000.00 in punitive damages for defamation; and

 e. Webber and MWP received an additional $400 for costs.

A copy of the *Second Amended Judgment* (the "**Webber Judgment**"), entered on June 21, 2022, is attached hereto as **Exhibit A**.

 ii. Also in *Webber*, the Court entered a judgment for attorneys' fees and costs in the amount of $117,884.71 against Dash and Poppington.[2]

A copy of the *Decision and Order: Attorney's Fees* (the "**Attorneys' Fees Order**"), entered on July 14, 2022, is attached hereto as **Exhibit B**.

 iii. In the case styled, *Brown v. Dash, et al.*, 20-10676 DSF (C.D. Cal. 2021), a judgment was entered as follows:

 a. An award of $50,000 in favor of Brown and against Damon Dash; and

 b. An award of $50,000 in favor of Brown and against Poppington.

A copy of the Judgment (the "**Brown Judgment**"), entered on December 29, 2022, is attached hereto as **Exhibit C**.

 3. The United States District Court for the Southern District of New York ("**NY Court**") was overseeing enforcement proceedings over the foregoing judgments when the above-captioned bankruptcy case was filed.

 4. On October 1, 2025, the NY Court stayed actions against the Debtor, but authorized enforcement proceedings to proceed against non-debtor entities, including

---

[2] This judgment is silent as to joint and several.

Poppington, an entity owned by the Debtor (the "**Enforcement Order**").   A copy of the Enforcement Order is attached hereto as **Exhibit D**.

5.     The Debtor claims Poppington has $0 value.  *See* BK Doc. No. 1.

6.     The NY Court, a federal court with original jurisdiction and authority over bankruptcy cases in general, although not the Court under which Dash filed his bankruptcy, stayed all action against the Debtor.

7.     An auction relating to the assets of Poppington (the "**Poppington Auction**") was proceeding prior to the undersigned counsel's involvement in this case and was just recently scheduled for December 30, 2025.  See attached **Exhibit E**.

8.     Undersigned counsel advised counsel for the Trustee of the Enforcement Order when the undersigned became aware of it, but in an abundance of caution, seeks to have this Court determine that the automatic stay does not exist, or alternatively seeks relief from the automatic stay imposed under 11 U.S.C. §362 to proceed with the Poppington Auction.

9.     "As a general rule, courts may adjudicate the liability of defendants not protected by the bankruptcy court's automatic stay, even though another defendant is protected by the bankruptcy stay."  *See, e.g., Carriage House Decorations, Inc. v. South Fla. Rest. Corp.*, No. 92-8736CIVNESBITT, 1995 WL 318567, at *2 (S.D. Fla. Feb. 28, 1995) (citing *United States v. Dos Cabezas Corp.*, 995 F.2d 1486, 1491 (9th Cir.1993)).

10.     The bankruptcy of one defendant does not normally stay the case as to non-debtor defendants absent unusual circumstances.  *Totten v. Kellogg Brown & Root, LLC*, 152 F.Supp.3d 1243,1268 (C.D. Cal. 2016) *citing Chugach Timber Corp. v. Northern Stevedoring & Handling Corp. (In re Chugach Forest Products, Inc.)*, 23 F.3d 241, 246 (9th Cir.1994) ("As a general rule, 'the automatic stay of section 362(a) protects only the debtor. . . . It does not protect non-

debtor parties. . . . Thus, section 362(a) does not stay actions against guarantors, sureties, corporate affiliates, or other non-debtor parties liable on the debts of the debtor.") (quoting *In re Advanced Ribbons & Office Prods.*, 125 B.R. 259, 263 (9th Cir. BAP 1991).

11.     A stay as to defendants other than a defendant/debtor is not warranted merely because "the allegations as to all Defendants appear to arise from the same factual and legal basis." *Wilson v. Lucado*, No. 5:08-CV-057 HL, 2008 WL 2223279, at *1 (M.D. Ga. May 23, 2008).

12.     A limited liability company member's bankruptcy estate "has no interest in property of an LLC and... the estate's property interest is limited to the member's distributional interest." *In re Jones*, 628 B.R. 819, 824 (Bankr. D.S.C. 2021) (citing *In re Brittain*, 435 B.R. 318, 321 (Bankr. D.S.C. 2010); *In re Moore*, 410 B.R. at 439, 442 (Bankr. E.D. Va. 2009) ("[A]lthough the debtor's interest in a corporation becomes property of the estate when a bankruptcy petition is filed, the corporation's property does not thereby become property of the shareholder's estate.")).   The automatic stay … does not extend to an LLC in which the individual debtor has an interest." *Jones*, 628 B.R. at 824.

13.     Thus, Dash's automatic stay does not extend to the assets of Poppington. However, should this Court find that the stay applies to the Poppington Auction in this case, in the alternative, Creditors seek relief from the automatic stay to pursue the Poppington Auction and retain proceeds pursuant to 11 U.S.C. §362(d), as cause exists under the circumstances.

14.     Cause exists because the Debtor has listed the value of the interest in Poppington as $0.   Poppington is not in bankruptcy and Creditors should not be barred from proceeding against this entity.   The Debtor will retain his interests in Poppington (the entity), as Creditors are not foreclosing on the LLC membership interests, just the assets (film and copyrights).   If

Poppington wanted protection from the automatic stay, it should be required to file its own bankruptcy case.

**WHEREFORE**, the Creditors respectfully request that this Court enter an order determining that the automatic stay does not apply to the auction of Poppington's assets, or alternatively, granting relief from the automatic stay to proceed with the Poppington Auction.

Dated: December 22, 2025.

/s/ Megan W. Murray
Megan W. Murray
Florida Bar Number 0093922
UNDERWOOD MURRAY, P.A.
100 N. Tampa Street, Suite 2325
Tampa, Florida 33602
Tel: (813) 540-8401 │ Fax: (813) 553-5345
Email: mmurray@underwoodmurray.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the foregoing, that was filed with the Clerk of Court, was furnished electronically to those parties registered to receive service via CM/ECF on December 22, 2025, including the United States Trustee, who is registered to receive electronic notices in this case, and emailed or mailed to the following as set forth below:

| **Debtor** | **Debtor's Attorney – Email** |
|---|---|
| Damon Anthony Dash | Brian D. Zinn |
| 6039 Cypress Gardens Blvd., $620 | Email: brian@zinn.law |
| Winter Haven, FL 33834 | |
| **Chapter 7 Trustee – Email** | **U.S. Trustee** |
| Katelyn M Vinson | United States Trustee - TPA7/13 |
| Email: kvinson@jennislaw.com | Timberlake Annex, Suite 1200 |
| Andrew J Wit | 501 E Polk Street |
| Email: awit@jennislaw.com | Tampa, FL 33602 |

/s/ Megan W. Murray
Megan W. Murray

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

JOSH WEBBER and                               :
MUDDY WATER PICTURES LLC d/b/a                :
MUDDY WATER PICTURES, INC.,                   :
                                              :
                        Plaintiffs,           :
         -against-                            :
                                              :
DAMON ANTHONY DASH and                        :
POPPINGTON LLC D/B/A DAME DASH                :
STUDIOS,                                      :
                                              :
                        Defendants.           :
_____:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____6/21/2022____

19-CV-610-RWL

**SECOND AMENDED
JUDGMENT**

Whereas on March 30, 2022, the jury rendered a unanimous verdict in favor of Plaintiffs Josh Webber ("Webber") and Muddy Water Pictures LLC d/b/a Muddy Water Pictures, Inc. ("Muddy"), and against Defendants Damon Anthony Dash ("Dash") and Poppington LLC d/b/a Dame Dash Studios ("Poppington") (see Dkt. 265); and

Whereas on June 20, 2022, Plaintiff Muddy filed a letter accepting partial remittitur of punitive damages pursuant to the Court's order and decision resolving Defendants' post-trial motion (see Dkt. 305, 309);

FINAL JUDGMENT is entered against Defendants jointly and severally, as follows:

1.      Muddy is declared to be the sole owner of the film "Dear Frank" aka "The List" pursuant to the United States Copyright Act;

2.      Defendants shall pay the sum of $30,000.00 to Muddy as statutory damages for copyright infringement pursuant to the United States Copyright Act;

3.      Defendants shall pay the sum of $25,000.00 to Muddy as punitive damages for defamation;

4.     Defendants shall pay the sum of $400,000.00 to Webber as compensatory damages for defamation;

5.     Defendants shall pay the sum of $250,000.00 to Webber as punitive damages for defamation;

6.     Defendants shall pay post-judgment interest on all amounts awarded at the rate of 1.55% per annum accruing from the date of entry of the judgment pursuant to 28 U.S.C. § 1961;

7.     Defendants shall pay Webber and Muddy a total of $400.00 as costs; and,

8.     Defendants are permanently enjoined from marketing, advertising, promoting, distributing, selling, or copying the film Dear Frank aka The List without Muddy's consent.


Dated: June 21, 2022
New York, New York

                              SO ORDERED.

                              _____
                              ROBERT W. LEHRBURGER
                              UNITED STATES MAGISTRATE JUDGE

# Exhibit B

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JOSH WEBBER, and                              :
MUDDY WATER PICTURES LLC d/b/a                 :
MUDDY WATER PICTURES, INC.,                    :
                                              :
                                              :
                            Plaintiffs,       :
                                              :
            - against -                       :
                                              :
DAMON ANTHONY DASH, and                        :
POPPINGTON LLC d/b/a                           :
DAMON DASH STUDIOS,                            :
                                              :
                            Defendants.        :
-------------------------------------------------------------X
```

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: _7/14/2022_

19-CV-610 (RWL)

**DECISION AND ORDER:
ATTORNEY'S FEES**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiffs Josh Webber ("Webber") and Muddy Water Pictures LLC ("Muddy") brought this action against Defendants Damon Anthony Dash ("Dash") and Poppington LLC ("Poppington") for copyright infringement and defamation. After three years of litigation and a four-day trial, a jury unanimously found the Defendants liable on both counts. At the heart of the case was Dash's false claim that he owned a film named "The List," later known as "Dear Frank" (the "Film"). The jury determined that Muddy, not Dash or Poppington, is the sole owner of rights in the Film and awarded $30,000 in statutory damages to Muddy for copyright infringement. Having prevailed, Muddy now seeks recovery of its attorney's fees expended in litigating the case pursuant to the Copyright Act, 17 U.S.C. § 505. For the reasons that follow, Defendants' motion is GRANTED, and Defendants must pay Muddy $117,884.71 in attorney's fees and costs.

## Background

The Court presumes the parties' familiarity with the facts and proceedings, which previously have been set forth by the Court in its decision denying summary judgment on the issue of copyright ownership,[1] and in its decision denying Defendants' post-trial motion addressing punitive damages for defamation.[2]  The Court sets forth below background to provide sufficient context for the instant decision.

### A.    Factual Background

The dispute between the parties centered on ownership in the Film's copyright, which turned on the parties' intent and their respective contributions.  As the evidence clearly showed, and as the jury found, Muddy is the sole owner of the Film's copyright. Indeed, from the outset of the case, Dash was preliminarily enjoined from marketing and promoting the Film, in part due to Plaintiffs' likelihood of success.[3]

Among other evidence presented at trial, the jury learned that Muddy controlled and made decisions on all key aspects of the Film.  (Tr. 241-42.[4])  Muddy financed and produced the Film.  (Tr. 212, 226.)  Muddy provided the script for the Film.  (Tr. 28, 220.) Muddy entered into work-for-hire agreements for the Film.  (Tr. 212, 215-18.)  Muddy, or others working for Muddy, hired the principal actors and production crew.  (Tr. 26, 28-29, 212.)  Muddy hired Webber to direct and help produce the Film.  (Tr. 25, 219.)  Muddy

---

[1] *Webber v. Dash*, No. 19-CV-610, 2021 WL 3862704 (S.D.N.Y. Aug. 30, 2021).

[2] *Webber v. Dash*, No. 19-CV-610, 2022 WL 2129025 (S.D.N.Y. June 14, 2022).

[3] *Webber v. Dash*, No. 19-CV-610, 2019 WL 1213008 (S.D.N.Y. Feb. 25, 2019).

[4] Tr." refers to the transcript of the trial, which was held on March 24-25 and 28-30, 2022 (Dkts. 275, 277, 279, 281, 283, 301.)  "PX" refers to Plaintiffs' exhibits admitted at trial, and "DX" refers to Defendants' exhibits.

never intended for Dash to be a joint author of the Film, instead retaining Dash for his celebrity cache to serve as "vanity director" and to promote the Film. (Tr. 41, 226-27, 253.) Muddy approved final edits to the Film. (Tr. 230-31.) Muddy applied for and obtained registration of the Film with the U.S. Copyright Office, making Muddy the presumptive sole owner. (PX 8; Tr. 214.)

Although Dash disputed much of Muddy's evidence, Dash was thoroughly discredited at trial. For instance, although he claimed to be at least a co-owner of the Film, Dash was impeached with a sworn declaration he submitted early in the case stating that he was hired by Muddy in return for a percentage of royalties. (Tr. 434-35; *see* PX 20.) Dash also was undermined by one of his own texts. Well over a year after shooting of the Film was complete, Dash sent a text to Webber suggesting that Dash did not believe he owned the Film at all until after it had been made and he realized its value. The exchange reads:

> Webber: Why do you think you "own" the movie
>
> Dash: I didn't feel that way until you pulled did this…
> Now I know what I can get for it.
> Way more than 100 grand.[5]

Dash's case, however, was not wholly devoid of support. Among other contributions, Dash provided his house as one of the locations for shooting the Film (Tr. 91), furnished some wardrobe (Tr. 356), provided use of supplemental camera equipment (Tr. 218), cast two of the actors (Tr. 36, 80-81, 258), and generally provided some

---

[5] (PX 33; Tr. 42-43.) In issuing its preliminary injunction against Defendants' marketing and distribution of the Film, the Court described Dash's text as "most compelling" and as indicating that Dash sought to turn the Film into a "bargaining chip." 2019 WL 1213008 at *6.

directorial and producing services (Tr. 36-37).  Further, a draft promotional poster for the Film, created before Muddy announced it had parted ways from Dash, identified both Muddy and Poppington as production companies behind the Film, identified Dash as director, and led with the headline, "Dame Dash Presents."[6]  (DX 2; Tr. 250-52.)

During trial, both Webber and Muddy put on overwhelming evidence that the Defendants maliciously defamed them in social media posts that Defendants issued in response to the parties' dispute about who directed and owned the Film.  *See generally* 2022 WL 2129025, at *1-2, 7.

## B.    Procedural Background

Muddy and Webber commenced this action on January 22, 2019.  On February 1, 2019, Muddy moved to preliminarily enjoin Defendants from marketing, advertising, or promoting the Film during pendency of the action.  (Dkt. 11.)  The Court granted the injunction on February 25, 2019.  (Dkt. 46.)  Discovery ensued, and, as discussed in the following section, was protracted by Dash.  At three different junctures, Muddy moved for summary judgment on its copyright ownership claim.  (Dkt. 63, 115, 203.)  The first two motions were denied.  (Dkt. 69, 157.)   The third motion, which came after completion of discovery, was partly successful, with the Court granting summary judgment to Plaintiffs that there was no oral agreement between the parties with respect to the Film, but denying the motion on the question of ownership based on other evidence.  *See* 2021 WL 3862704, at *6-10.

---

[6] Various other pieces of evidence identified Dash as director of the Film, at least in its production phase (*e.g.*, DX 9; Tr. 149-50, 154), but the issue at trial was who authored and owned the Film, not merely who directed it.  Moreover, the jury apparently accepted that Dash was hired by Muddy to be a "vanity director" and for his celebrity status, while Muddy hired Webber to actually direct the Film.  (*See* Dkt. 165.)

A jury trial commenced on March 24, 2022 and concluded on March 29, 2022.  The jury returned its verdict on March 30, 2022, finding that Dash and Poppington failed to prove that they were either dominant or joint authors of the Film.  (Dkt. 265.)  The jury found that both Defendants infringed Muddy's copyright in the Film, although not willfully.  The jury awarded Muddy $30,000 in statutory damages, the highest amount permitted for non-willful infringement.  S*ee* 17 U.S.C. § 504(c)(1).  Finally, the jury found both Defendants liable for defaming both Muddy and Webber, awarding Webber compensatory damages in the amount of $400,000 and punitive damages in the amount of $250,000, and finding no compensatory damages for Muddy but awarding Muddy $125,000 in punitive damages.

The Court entered an Amended Judgment on April 11, 2022.[7]  (Dkt. 274.)  Following entry of the Amended Judgment, Defendants moved for a new trial or remittitur of punitive damages with respect to the defamation verdict.  The Court granted the motion in part and denied it in part, and entered the Second Amended Judgment on June 21, 2022.  (Dkt. 310.)

## C.    Defendants' Litigation Misconduct

Dash's misconduct during this case has been a repeated flash point.  He has tried to intimidate Plaintiffs' lawyer, defied court orders, protracted discovery, disrupted attempts to complete his deposition, and repeatedly changed his sworn testimony.

---

[7] The judgment was first amended to address typographical errors.  (*See* Dkt. 272 (Plaintiffs' letter requesting corrections).)

## 1. Dash's Personal Attacks On Plaintiffs' Counsel

At the beginning of the case, Dash emailed Plaintiffs' lawyer, Christopher Brown, threatening "to make an example out of him publicly" by suing him, calling him a "con man" and "dumb ass," and stating that "your law career is over." (Dkt. 14 at ECF 5.) In response to an email providing Dash with a copy of a letter filed with the Court, Dash asserted that "I'm suing your punk ass."[8] (Dkt. 16.) In a social media post that was an exhibit at trial Dash defamed Brown as a "crooked lawyer" and, along with Plaintiffs, as having robbed a seven-year-old child in connection with a movie.[9] (PX 5; Tr. 54-55.)

Dash continued his attacks on Brown during discovery, making a mockery of the discovery process at the same time. At an attempted deposition of Dash on November 21, 2022, Dash responded to questions by levying numerous personal insults against Brown. For example, in response to the question of where he went to high school, Dash responded:

> Next question. This ain't got nothing to do with it. I don't care. I don't want to go through all of this. He's just trying to run his bill up like a little – like a snarky little lawyer like he is, and ask me stupid questions, and waste my time. I don't mind. You can show the judge this.

(Dash Depo. I at 8-9.[10])

---

[8] In a memo endorsement on an early request by Dash for an extension of time, the presiding judge at the time, then Chief Judge McMahon, commented that "as evidenced by emails he inadvertently sent to chambers, [Dash] is indeed being 'difficult and unprofessional.'" Dkt. 21 (quoting language attributed by Dash's lawyer to Plaintiffs' lawyer Brown).

[9] Brown successfully sued Dash for defamation in California federal court. *Brown v. Dash*, No. CV 20-10676, 2021 WL 4899021(C.D. Cal. Sept. 29, 2021).

[10] "Dash Depo. I" refers to the Transcript Of Deposition Of Damon Dash, Nov. 21, 2019, attached as Ex. A to Affidavit Of Christopher Brown dated June 7, 2021 (Dkt. 214) ("7/7/2021 Brown Aff.").

When Brown explained that Dash should let him know if at any point Dash does

not understand a question, Dash interjected:

> I don't understand why you're trying to rob me, and why you're
> representing everybody, because you're a clown. That's my
> question. What you here for? You're trying to protect your
> own hide.

(*Id.* at 11-12.)

During a lawyer colloquy, when Mr. Brown said "We can't all speak at the same

time," Dash interrupted:

> This gives you no power. It just makes you look stupid. I'm
> going to ruin you as a lawyer. You'll never be a lawyer again.
> …. I'm just giving you rope to hang yourself. You're going to
> be in a whole nother courtroom, in a whole nother place.

(*Id.* at 19.)

Other examples of Dash's taunting include: Brown "has no kids, I bet. If he do,

they sick with him" (*id.* at 20); "You're less of a man. Everybody laughs at you" (*id.*); "You

should be disgusted with yourself, Black people like you who don't care about other

people" (*id.* at 21); "you look silly, and you have a stupid-looking collar on your sweater"

(*id.* at 62); "your face looks crazy" (*id.* at 65); "I'm laughing at you" (*id.* at 66); "You're a

joke. I'm enjoying this shit" (*id.*); and so on.

### 2. Dash's Willful Failure To Comply With Discovery And Court Orders

Dash failed to respond to Plaintiffs' very first set of document requests,

interrogatories, and notice of deposition. On May 28, 2019, the Court held a hearing and

found that Defendants willfully failed to respond to the demands; defense counsel even

conceded that Defendants had no excuse. (Dkt. 74.) The Court also imposed deadlines

for Defendants to comply with discovery obligations and warned that failure to comply could result in sanctions. (*Id.*)

Dash did not comply. As the Court found at a show cause hearing held on July 10, 2022, Dash willfully did not comply with the Court's May 28, 2019 order by failing to timely provide discovery responses and documents and canceling his deposition just three days before the date to which counsel previously had agreed. (*See* Dkts. 77, 78, 88.) The Court imposed monetary sanctions on Defendants and defense counsel jointly for violating the Court's orders and unnecessarily causing Plaintiff to incur costs to obtain relief from the Court. (Dkt. 88.)

The parties next arranged for Dash's deposition to take place on October 10, 2019. On October 7, 2019, however, again only three days before the date previously agreed upon, counsel for Dash informed Plaintiffs' counsel that Dash again would not be attending his deposition. (*See* Dkt. 99.) On October 15, 2019, the Court set a date for another hearing at which Dash would be required to show why he should not be sanctioned for failing to appear at his deposition on the agreed-upon date. (Dkt. 100 ¶ 1.) The Court's order also required that Dash make himself available to be deposed on a day preceding the hearing date. (*Id.* ¶ 2.)

Dash finally appeared, thirty minutes late, for his deposition on November 21, 2019. (*See* Dkt. 102.) However, as described above, he used the deposition as a platform to launch insults against Plaintiffs' counsel. And with less than an hour into the deposition, Dash became sufficiently unruly that the local law firm hosting the deposition terminated the deposition and called 911 to have Dash removed from the building. (*See* Dkts. 102, 131.)

Accordingly, at the show cause hearing held on November 22, 2019 (the day after the deposition fiasco), the Court sanctioned Dash by requiring him to pay costs for his "repeated disregard of court orders and highly inappropriate conduct during his November 21, 2019 deposition." (Dkt. 103.) On February 10, 2020, the court again ordered Dash to appear for continuation of his deposition and that he pay all costs associated with the deposition on February 10, 2020. (Dkt. 131.) As the Court observed: Dash has "repeatedly obstructed the discovery process, engaged in conduct warranting imposition of sanctions, and otherwise demonstrated disregard for the orderly administration of justice." (*Id.*)

Unfortunately, Dash did not reform his behavior. The fourth attempt at Dash's deposition was scheduled for November 20, 2020. But ten days before that, Dash once again cancelled the taking of his deposition. (*See* Dkt. 165.) Despite Plaintiffs' reasonable request for terminating sanctions, the Court provided Dash "a last and final opportunity" to complete his deposition, requiring it to be completed by the end of January 2021. (Dkt. 175.)

Once again, however, Dash managed to frustrate completion of his deposition. The deposition had to be terminated because other participants, including the court reporter, could not sufficiently hear what Dash was saying. (*See* Dkt. 186.) Whether that was due to purposeful conduct, however, was unclear. As the Court noted, "the fact that [Dash] was the only person involved in the deposition who could not be clearly heard is highly suspect. That said, the court cannot conclude … that the problems with Dash's audibility were intentionally caused by Dash purposefully speaking in a low voice behind the two masks he was wearing." (Dkt. 187.)

Dash finally appeared, by remote means, for completion of his deposition on March 15, 2021. Even then, Dash continued to frustrate matters by refusing to answer questions on a subject – Defendants' recent asset transfers – the Court expressly directed was an appropriate subject for deposition. (*See* Dkts. 181, 193, 194, 198.)

Dash not only repeatedly violated orders concerning discovery; he also violated the preliminary injunction by failing to remove social media postings that marketed and promoted the Film. (Dkts. 143, 147.)

### 3. Dash's Shifting Sworn Testimony

Dash also has exhibited misconduct by repeatedly changing his sworn testimony about his purported role and ownership in the Film.

At the outset of the case, in opposing Muddy's motion for a preliminary injunction in February 2019, Dash averred that he "was hired" by Muddy to direct and produce the Film "in return for a 25% net interest in the Film's royalties (which I was to co-own, in perpetuity)." (Dash Decl. I at ¶ 20.[11]) Dash conceded that there was no written agreement, contending instead that he and Muddy had a verbal agreement. (*Id.* at ¶¶ 20, 22.) Shortly after the Court granted Muddy's motion, Dash again asserted, by way of counterclaim, the same verbal agreement by which he "was hired" by Muddy. (Answer and Counterclaim (Dkt. 48) at ¶ 16.) This time, however, Dash omitted the phrase "in perpetuity."[12]

---

[11] "Dash Decl. I" refers to the Declaration of Damon Dash dated Feb. 11, 2019 (Dkt. 26).

[12] A likely explanation for Dash's omission of the phrase "in perpetuity" is that just two days earlier the Court granted Muddy's motion for a preliminary injunction based, in part, on having held that the oral agreement for royalties in perpetuity asserted by Dash was unenforceable under the statute of frauds. (Dkt. 46 at 12.)

About a year later in both February (in response to Muddy's second motion for summary judgment as to defamation) and March 2020 (in response to Muddy's second motion for summary judgment as to authorship and ownership), Dash submitted declarations describing an oral agreement with Muddy much different from the one he first described in February 2019. Instead of saying he "was hired" by Muddy, Dash asserted that "it was agreed by [Muddy] that I would direct and produce the film" in return for the same 25% net interest in the film's royalties and co-ownership.[13] (Dash. Decl. II at ¶ 3; Dash Decl. III at ¶ 18.) According to Dash, his agreement with Muddy "was conditioned on there being a $250,000 budget which I was promised," even though his earlier declaration and counterclaim did not mention any such condition. (*Id.*) Dash also newly asserted that the "original verbal agreement/promise" was made by someone named Tony White, who worked for Muddy. (Dash Decl. II at ¶¶ 3-4; Dash Decl. III at ¶ 18.) Dash avowed that White offered him White's own 25% interest in the Film and that Muddy's principal, Mike Muntaser, "acquiesced and ratified this verbal agreement," thus giving Dash a total of 50% interest in the Film. (Dash Decl. II at ¶ 6; Dash Decl. III at ¶ 20.) Even further, according to Dash, Muddy promised Dash "total creative control." (Dash Decl. II at ¶ 6; Dash Decl. III at ¶ 21.)

In deposition testimony, however, Dash denied the existence of a written or oral agreement with Muddy. In the first installment of his deposition taken on November 21, 2019, Dash testified: "The nature of my relationship with Muddy was never ever, ever articulated." (Dash Depo. I at 39.) And in January 2021, Dash testified that he did not

---

[13] "Dash Decl. II" refers to the Declaration of Damon Dash dated Feb. 18, 2020 (Dkt.136); "Dash Decl. III" refers to the Declaration of Damon Dash dated March 4, 2020 (Dkt. 148).

recall any agreement with Muddy "at all." (Dash Depo. II at 15.[14]) Dash also admitted that he did not even meet Muntaser "until after the whole movie was shot." (Dash Depo. I at 39-40; *see also* Dash Depo. III at 46 ("Again, my acknowledgement of Muddy is after the film was shot, not before").[15])

In opposing Muddy's third motion for summary judgment, however, Dash reversed course, asserting that a verbal agreement was made between Muddy and Dash. In support of that contention, however, he relied on the same February 2020 declaration submitted to the Court before his 2021 re-admission noting that there was no agreement. (Defendants' Rule 56.1 Response (Dkt. 213) at ¶¶ 4, 18-20.)

Then, at trial, Dash once again denied being hired by Muddy. Confronted with his initial declaration in the case in which he affirmatively stated he had been hired by Muddy, Dash strained credulity, claiming he "must not have understood it"; then claiming "I have problems with my eyes. I just got cataract surgery. I just read e-mails. I get the gist of it"; and then claiming, "It must have been a mistake." (Tr. 434-36.)

### Discussion

### I.    An Award Of Attorney's Fees Is Warranted In This Case

In a copyright action, a court "in its discretion may allow the recovery of full costs … [and] may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. It is beyond dispute that Muddy is a prevailing party under

---

[14] "Dash Depo. II" refers to the Transcript Of Deposition Of Damon Dash, Jan. 29, 2021, attached as Ex. C to 7/7/2021 Brown Aff.

[15] "Dash Depo. III" refers to the Transcript Of Deposition Of Damon Dash, March 15, 2021, attached as Ex. D to 7/7/2021 Brown Aff.

Section 505. The jury found that Muddy is the sole owner of the copyright in the Film, that neither Defendant is a joint owner of the Film, and that Defendants are liable for copyright infringement.

As for the factors considered in determining whether to award attorney's fees pursuant to Section 505:

> The Supreme Court has identified 'several nonexclusive factors' to guide district courts in exercising their discretion under section 505, including frivolousness, motivation, objective unreasonableness, and the need in particular circumstances to advance considerations of compensation and deterrence." *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 202 (2016) (alterations adopted) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)); *see also Manhattan Rev. LLC v. Yun*, 765 F. App'x 574, 576 (2d Cir. 2019). "Although objective reasonableness carries significant weight, courts must view all the circumstances of a case on their own terms, in light of the Copyright Act's essential goals." *Kirtsaeng*, 579 U.S. at 209. Courts may award fees even without a finding of unreasonableness "because of a party's litigation misconduct" or "to deter repeated instances of copyright infringement or overaggressive assertions of copyright claims." *Id*. A court may also consider other factors, so long as they are consistent with the Copyright Act's "purpose of enriching the general public through access to creative works," striking a balance between encouraging authors' novel creations and enabling others to build upon that creative work. *Fogerty*, 510 U.S. at 527.

*Capitol Records, LLC v. ReDigi Inc.*, No. 12-CV-95, 2022 WL 1046463, at *3 (S.D.N.Y. Apr. 7, 2022) (Sullivan, J., sitting by designation). Consideration of those factors in this case well supports awarding reasonable attorney's fees and costs to Muddy.

Defendants' primary contention – that they were the dominant authors and thus sole owners, or at least joint authors and thus co-owners, in the Film – comes close to

being objectively unreasonable.[16]   "'Objective unreasonableness' is generally used to describe claims that have no legal or factual support."  *Viva Video, Inc. v. Cabrera*, 9 F. App'x. 77, 80 (2d Cir. 2001); *see also Muller v. Twentieth Century Fox Film Corp.*, No. 08-CV-2550, 2011 WL 3678712, at *1 (S.D.N.Y. Aug. 22, 2011) ("A copyright infringement claim is objectively unreasonable when the claim is clearly without merit or otherwise patently devoid of legal or factual basis." (internal quotation marks omitted)).

On summary judgment, this Court determined that there were issues of disputed fact material to determining whether Defendants and Muddy mutually intended to be co-authors, or, if not, who is the dominant author of the Film.  *See Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998) (a co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors); *16 Casa Duse, LLC v. Merkin*, 791 F.3d 257, 260 (2d Cir. 2015) (where two or more parties each contribute the requisite degree of expression to a work but do not mutually intend to be co-authors, the "dominant" author of the work is deemed the work's sole author).

More particularly, the Court found genuinely disputed facts concerning the parties' intent and each party's contributions to the Film.  To be sure, the evidence in Muddy's favor at summary judgment was strong.  Among other evidence, Muddy entered into the contracts with cast and crew; Dash's first sworn declaration in the case stated that he was "hired" by Muddy; and Dash essentially conceded in a text message that he was holding

---

[16] "A district court that has ruled on the merits of a copyright case can easily assess whether the losing party advanced an unreasonable claim or defense." *Kirtsaeng,* 579 U.S. at 207, 136 S. Ct. at 1987.  The Court has intimate familiarity with the merits of the claims in this case having both ruled on summary judgment and presided over trial.

up distribution of the Film because he newly realized its potential value. Defendants, on the other hand, offered materials Dash received from Muddy in which he was billed as director and Dash's production company logo appears along with Muddy's. As the Court commented, "Although Dash's evidence may be thin, and belied by his own words and contradictions, it is enough to create a genuine dispute regarding whether the parties fully intended to be co-authors." 2021 WL 3862704 at *9.

Similarly, the Court found conflicting evidence with respect to the parties' contributions to the Film. Muddy put forward evidence that he was the executive producer of the Film, hired Webber who directed the Film, and paid to produce the Film, while Dash did not materially contribute and was high on set and disruptive. Dash submitted evidence that he provided his house for the main set and shooting location, contributed camera equipment for filming, and to some extent provided input on the script, coaching of the actors, and editing of the Film.

At trial, the same proof, and more, was presented. In testifying, Dash came across as dishonest and predatory.[17] The jury clearly did not believe him, and found in favor of Muddy. From an objective viewpoint, the odds were highly stacked against Defendants,

---

[17] *See, e.g.*, Tr. 434-36 (Dash dissembling in an effort to escape his previously having admitted that he was hired by Muddy), Tr. 467 (impeaching Dash about deposition testimony claiming he paid for everything for the Film except the edits), 472-73 (Dash contradicting himself, saying "we never really agreed to anything" but then claiming there was a "conceptual agreement"); Tr. 31-32, 101-02 (Dash making principal actress uncomfortable "from day one" by, inter alia, urging her to watch pornography to prepare for a scene); Tr. 131-37 (Dash threatening and "blackmailing" the principal editor of the Film).

and the Court finds that Defendants' contentions came right up to the line of unreason. But the Court does not find that Defendants crossed that line.[18]

Nonetheless, other relevant factors strongly weigh in favor of awarding attorney's fees. In particular, Defendants' litigation misconduct and the interest in deterrence, strongly weigh in favor of granting attorney's fees to Muddy.[19]

As recounted in the factual background above, Dash repeatedly engaged in misconduct throughout this case. He derailed discovery by cancelling his deposition multiple times. When he was deposed, he used his deposition as a platform to mock and harangue Plaintiffs' counsel. He violated multiple court orders regarding his discovery obligations. He repeatedly dissembled, modifying his sworn testimony to what was most expedient at the moment. All of these, independently and together, constitute litigation misconduct. *See*, *e.g.*, *Capital Records LLC v. ReDigi, Inc.*, No. 12-CV-0095, 2022 WL 1046463, at *7 (S.D.N.Y. April 7, 2022) (awarding attorney's fees due in part to

---

[18] For the same reasons, the Court does not find Defendants' contentions to have been "frivolous." A claim "is frivolous when there 'is indisputably absent any factual or legal basis' " for it. *Hallford v. Fox Entertainment Group, Inc.*, 12-cv-1806, 2013 WL 2124524, at *1 (S.D.N.Y. Apr. 18, 2013) (quoting *Neitzke v. Williams*, 490 U.S. 319, 323, 109 S.Ct. 1827, 1830 (1989)). "Frivolousness is a distinct factor from objective unreasonableness, and although the line between the two is not always well defined, it is generally considered a particularly intense form of objective unreasonableness." *Latin American Music Co., Inc. v. Spanish Broadcasting Systems, Inc.*, No. 13-CV-1526, 2020 WL 2848232, at *3 (S.D.N.Y. June 1, 2020) (internal quotation marks and citation omitted).

[19] As for the "compensation" factor, the evidence is equivocal. On the one hand, Muddy financed the entirety of the Film, and Defendants' assertion of competing rights over the Film compromised Muddy's ability to market and distribute the Film. (See PX 13; Tr. 236-39 (loss of sponsorship deal due to Dash).) The jury awarded $30,000 in statutory damages for Defendants' infringement, but that award does not account for damages, if any, due to Defendants' assertion of ownership. On the other hand, Muddy ultimately was able to license the Film to a streaming service for $75,000 (Tr. 332), and although the initial budget for the Film was $250,000 (Tr. 249, 301-02), it is not evident how much Muddy actually spent on the Film.

defendant's shifting assertion of facts and "burdensome stall tactics"); *Latin American Music Co.*, 2020 WL 2848232, at *5 (awarding attorney's fees due in part to "unreasonable conduct, including during discovery and through trial, which concededly made life more difficult for [the opposing party] (and the Court)") (internal quotation marks omitted); *John Wiley & Sons, Inc. v. Book Dog Books*, *LLC*, 327 F. Supp.3d 606, 643 (S.D.N.Y. 2018) (awarding attorney's fees due in part to defendant's "discovery evasions").

The need for deterrence also supports awarding attorney's fees in this case, which is not the first time that Dash has wrongfully asserted copyright ownership in a film. Even before the verdict against Dash here, Defendants were found liable for marketing a film that they worked on but to which they did not own the copyright. *Brooks v. Dash*, 454 F. Supp.3d 331 (S.D.N.Y. 2020). In *Brooks*, as the jury did here, the court rejected Dash's contentions that he was a co-author or dominant author of the Film. *Id.*, 454 F. Supp.3d at 338. As could be said equally about this case, Judge Rakoff found that Dash's testimony in *Brooks* was "self-serving" and "lacked credibility." *Id.* Dash's recidivism calls for deterrence. *See Kirstaeng*, 579 U.S. at 209, 136 S. Ct. at 1989 (court may award attorney's fees "to deter repeated instances of copyright infringement or overaggressive assertions of copyright claims, again even if the losing position was reasonable in a particular case") (citing *Bridgeport Music, Inc. v. WB Music Corp.*, 520 F.3d 588, 593-95 (6th Cir. 2008)); *Latin American Music Co.*, 2020 WL 2848232 at *4 (finding in copyright infringement case that "[t]he case for specific deterrence is particularly strong" against plaintiffs who had brought similar claims in the past). The *Brooks* court did not award attorney's fees for the copyright claim because the infringement at issue started before

17

the registration of Brooks' copyright. *Brooks*, 454 F. Supp.3d at 340; *see* 17 U.S.C. § 412 (barring attorney's fees for infringement of copyright in unpublished work commenced before effective date of registration). A deterrent thus has not been previously imposed. There is thus all the more reason to award attorney's fees here as a deterrent to further such conduct.

Having found that awarding attorney's fees is warranted, the Court now turns to determining the amount of those fees.

## II.    The Amount Of Reasonable Fees

Muddy seeks recovery of $112,055.00 in attorney's fees. (Brown Aff.,[20] Ex. A at 7.) Although Defendants oppose awarding attorney's fees at all, they have not contested the amount of fees sought. Even so, the Court finds that the fees submitted by Muddy are reasonable.

The traditional approach to determining a fee award is the "lodestar" calculation, which is the number of hours expended multiplied by a reasonable hourly rate. *See Healey v. Leavitt*, 485 F.3d 63, 71 (2d Cir. 2007); *Tackie v. Keff Enterprises LLC*, No. 14-CV-2074, 2014 WL 4626229, at *6 (S.D.N.Y. Sept. 16, 2014). The Second Circuit has held that "the lodestar … creates a 'presumptively reasonable fee.'" *Millea v. Metro-North Railroad Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008); and then citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552, 130 S. Ct. 1662, 1673 (2010)); *see also Stanczyk v. City Of New York*, 752 F.3d 273, 284-85 (2d Cir. 2014)

---

[20] "Brown Aff." refers to the Affidavit Of Christopher Brown In Support Of Motion For Legal Fees filed on June 15, 2022 (Dkt. 308.)

(reaffirming *Millea*).  To arrive at a lodestar calculation, "[t]he party seeking an award of [attorney's] fees should submit evidence supporting the hours worked and rates claimed." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939 (1983).  Plaintiff has submitted such evidence here, including a declaration from counsel along with billing records.  (Brown Aff. and Ex. A.)

**Hourly Rates:**  Courts assess the reasonableness of a proposed hourly rate by considering the prevailing market rate for lawyers in the district in which the ruling court sits.  *Polk v. New York State Department of Correctional Services*, 722 F.2d 23, 25 (2d Cir. 1983).  "The rates used by the court should be current rather than historic hourly rates." *Reiter v. Metropolitan Transportation Authority Of New York*, 457 F.3d 224, 232 (2d Cir. 2006) (internal quotation marks omitted).  "[C]ourts may conduct an empirical inquiry based on the parties' evidence or may rely on the court's own familiarity with the rates if no such evidence is submitted." *Wong v. Hunda Glass Corp.*, No. 09-CV-4402, 2010 WL 3452417, at *2 (S.D.N.Y. Sept. 1, 2010) (internal quotation marks omitted). Additionally, "the range of rates that a plaintiff's counsel actually charges their clients … is obviously strong evidence of what the market will bear." *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 544 (S.D.N.Y. 2008); *see also Lilly v. County of Orange*, 910 F. Supp. 945, 949 (S.D.N.Y. 1996) ("The actual rate that counsel can command in the market place is evidence of the prevailing market rate").

Plaintiff is represented in this action by Christopher L. Brown of Brown & Rosen LLC, a small firm located in Boston, Massachusetts.  Brown single-handedly litigated the instant case, charging $500.00 per hour in 2019 and 2020, and $550.00 per hour in 2021 and 2022.  Brown has been licensed to practice law in New York as well as

Massachusetts for over twenty years. (Brown Aff. ¶ 2.) Among other relevant experience, Brown has litigated commercial, entertainment, and intellectual property cases, including in New York. (*Id.* ¶ 4.) Brown's experience even includes litigating other cases against Dash and Poppington. *See, e.g.*, *Brown v. Dash*, 2021 WL 4899021 (awarding Brown partial summary judgment against Dash on defamation claim); *Brooks*, 454 F. Supp.3d 331 (after bench trial, finding Dash and Poppington liable for copyright infringement).

The Court finds the rates charged for the work on this case are reasonable. They are consistent with rates charged for similar litigation in the New York metropolitan area. *See, e.g.*, *Latin American Music Co.,* 2020 WL 2848232 at *6 (observing that courts in copyright cases consider reasonable rates of $400 to $750 an hour for partners) (citing, inter alia, *Broadcast Music, Inc. v. Pamdh Enterprises, Inc.*, No. 13-CV-2255, 2014 WL 2781846, at *6-7 (S.D.N.Y. June 19, 2014) (approving hourly rates of $570 for partner with 15 years' experience in copyright law); *Pyatt v. Raymond*, 10-CV-8764, 2012 WL 1668248, at *6 (S.D.N.Y. May 10, 2012) (collecting cases approving rates ranging from $400 to $650 for partners in copyright and trademark cases). And Brown brought added value to the case given his experience litigating other cases against Defendants.

**Hours Worked:** To determine properly compensable hours, "the court must examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case." *Tlacoapa v. Carregal*, 386 F. Supp. 2d 362, 371 (S.D.N.Y. 2005) (citing *Gierlinger v. Gleason*, 160 F.3d 858, 873, 876 (2d Cir. 1998)). "In making this examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Gierlinger*, 160 F.3d

at 876. "The relevant issue ... is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992); *see also Mugavero v. Arms Acres, Inc.*, No. 03-CV-5724, 2010 WL 451045, at *6 (S.D.N.Y. Feb. 9, 2010) (same). A court thus should exclude from the lodestar calculation "excessive, redundant or otherwise unnecessary hours." *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999); *see also Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997) ("If the district court concludes that any expenditure of time was unreasonable, it should exclude these hours from the lodestar calculation"). However, a prevailing party need not achieve success on every motion to recover time devoted to such motion. *Gortat v. Capala Brothers, Inc.*, 621 F. App'x. 19, 23 (2d Cir. 2015) ("there is no rule that [p]laintiffs need achieve total victory on every motion in pursuit of a successful claim in order to be compensated for the full number of hours spent litigating that claim").

The time records submitted reflect that Muddy's attorney worked a total of 218.3 hours in connection with Muddy's copyright claim. (Brown Aff. ¶ 10 and Ex. A.) Importantly, the hours for which Muddy seeks recovery are those necessary to only the copyright claim; they do not include time devoted to the defamation claims. (*Id.* ¶¶ 8-10 and Ex. A at 1 (billing "[r]edacted and revised to remove services related to defamation claim").) The Court has reviewed the records and finds the time spent to be reasonable. The work performed is of the nature and type that would be expected for a copyright ownership and infringement case such as this one that proceeded all the way through trial. The case lasted over three years; it started with Muddy's successful motion for a

preliminary injunction; proceeded through discovery, which was protracted by Dash's misconduct; included summary judgment briefing, albeit only partially successful; required trial preparation and submissions; and culminated in four days of trial. The total number of hours reflects substantial efficiency given the amount of work involved.[21]

The billing records submitted are not exemplary. They contain block billing – a practice disfavored in this District – with multiple tasks listed together for the same day and even over the course of several days.[22] Additionally, it is not apparent whether any of the work billed at Mr. Brown's rates is work that could more cost-effectively have been performed by a more junior attorney, paralegal, or administrative staff. But, notwithstanding those lapses, the total time expended by Brown alone is quite reasonable, again reflecting counsel's efficiency and experience. And, as also noted, Defendants have not contested the amount of fees sought. Having determined that the fees sought are reasonable, the Court finds that Plaintiff should be awarded attorney's fees in the amount of $112,055.

## III.    Costs

Muddy seeks $5,829.71 in costs for three groups of expenditures:  creation and mailing of trial exhibit books ($150.00); hotel ($1,163.93) and parking ($300.00) during

---

[21] Not all of Plaintiffs' pre-trial efforts were successful – they moved for summary judgment on multiple occasions and pursued termination sanctions aggressively – but that lack of success does not countenance deduction of fees incurred in connection with those efforts. *Gortat*, 621 F. App'x. at 23. Moreover, many of Plaintiffs' applications were made through efficient use of letter motions rather than full-blown briefing.

[22] *See*, *e.g.*, *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 188 F. Supp.3d 333, 340 (S.D.N.Y. 2016) ("courts look unfavorably on block billing and vagueness in billing because imprecise entries limit their ability to decipher whether the time expended has been reasonable") (internal quotation marks, brackets, and citation omitted).

trial; and trial transcript fees ($4,215.78).  (Brown Aff., Ex. A at 7.)  "[I]t is well-established

that the expenses recoverable under fee-shifting statutes … are not limited to the costs

taxable under 28 U.S.C. § 1920 and Local Civil Rule 54.1." *Garcia v. City of New York*,

No. CV 11-2284, 2013 WL 5574507, at *9 (E.D.N.Y. Oct. 9, 2013).  Fee awards thus

"'normally include those reasonable out-of-pocket expenses incurred by the attorney and

which are normally charged fee-paying clients.'"  *Trustees of N.Y.C. District Council of

Carpenters Pension Fund, Welfare Fund, Annuity Fund v. B&L Moving & Installation, Inc.*,

No. 16-CV-4734, 2017 WL 4277175, at *8 (S.D.N.Y. Sept. 26, 2017) (quoting *Reichman

v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir. 1987)), *R. & R.

adopted*, 2018 WL 705316 (S.D.N.Y. Feb. 5, 2018).  The Court has reviewed Plaintiff's

submissions and finds the costs set forth are reasonable and recoverable.  Accordingly,

Plaintiff should be awarded $5,829.71 in costs.

## Conclusion

For the foregoing reasons, Plaintiffs' motion is GRANTED.  Defendants shall pay

Plaintiffs $117,884.71 in reasonable attorney's fees and costs.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: July 14, 2022
      New York, New York

# Exhibit C

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DIVISION OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER BROWN | **CASE NO. 20-CV-10676-DSF** |
| Plaintiff, | |
| vs. | JUDGMENT |
| DAMON ANTHONY DASH, DAME DASH STUDIOS, POPPINGTON LLC, THE DASH GROUP LLC AND RAQUEL HORN | |
| Defendants. | |

After conclusion of a jury trial on December 7, 2022, a jury rendered a verdict in favor of the Plaintiff Christopher Brown against the defendants Damon Dash and Poppington LLC for defamation of character pursuant to Massachusetts law.   Judgment is entered as follows:

1.    This action was filed on November 23, 2020 and a verdict was entered on December 7, 2022.

2.    A judgment award for Christopher Brown in the amount of Fifty Thousand Dollars ($50,000.00) against Damon Dash shall enter.

3.    A separate judgment award for Christopher Brown in the amount of Fifty Thousand Dollars ($50,000.00) against Poppington LLC shall enter.

4.    The total sum of the judgment is One Hundred Thousand Dollars ($100,000.00).

5.    Each defendant shall pay Pre-Judgment interest from the time period between the filing of the lawsuit and rendering of the verdict, totaling 744 days pursuant to M.G.L. c. 231 section 6B and 6C (November 23, 2020 and a verdict was entered on December 7, 2022).

6.    Each defendant shall pay Post-Judgment interest pursuant to M.G.L. c. 235, section 8.

7.  The applicable interest rate pursuant to Massachusetts law is .033 percent daily, totaling $32.88 per day on a total of $100,000.00, attributed equally to each defendant. The interest will accrue from all time interest periods at the rate of 12% per annum, pursuant to M.G.L. c 231 section 6B and 6C.

8.    Each defendant shall pay pre-judgment interest, 12% per annum for 744 days in the amount of $24,462.72 on a judgment of $100,000.00 to be split equally between the defendants.  Damon Dash owes pre-judgment interest in the amount of $12,231.36 and Poppington LLC owes pre-judgment interest in the amount of $12,231.36 to Christopher Brown.

9.    Each defendant shall pay post-judgment interest from the day between the rendering of the verdict and the entry of the judgment for 22 days, from December 7, 2022 through December 29, 2022 pursuant to M.G.L. c. 235, section 8. Total post-judgment interest through December 29, 2022, is $723.36.  Damon Dash owes post-judgment interest in the amount of $361.68 and Poppington LLC owed post-judgment interest in the amount of $361.68.

10.    Defendant shall be responsible for interest from the day the judgment is entered to the time it is paid in full, in the amount of 12% per annum pursuant to M.G.L. c. 235 and M.G.L. c 231 section 6B and 6C.

11.    Damon Dash and Poppington LLC are jointly and severally responsible for Christopher Brown's costs in the amount of $400.00 for the filing fee.


Date: December 29, 2022


Dale S. Fischer
United States District Judge

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

JOSH WEBBER and MUDDY WATER      :
PICTURES LLC d/b/a MUDDY WATER     :
PICTURES, INC.,                             :
                  Plaintiffs,     :

                                       :            19-CV-610 (RWL)
      - against -            :
                                       :             **ORDER**

DAMON ANTHONY DASH and         :
POPPINGTON LLC D/B/A DAME DASH   :
STUDIOS,                               :
                                       :
                 Defendants.    :

------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

      Due to the notice of bankruptcy filed on September 4, 2025 (Dkt. 489), enforcement proceedings against Damon Dash personally have been stayed. So that the Court may remain advised of Mr. Dash's status, Mr. Dash shall file a letter every 6 months reporting the status of his bankruptcy proceeding. Notwithstanding the foregoing, Mr. Dash shall file a letter no later than 10 days after his bankruptcy proceeding progresses to the point where the stay in this case with respect to him individually can be lifted.

      Enforcement proceedings are not stayed as to Defendant Poppington LLC. Public auction of Poppington's films and copyrights may proceed. Further, public auction of Dash's assets that were assigned to the U.S. Marshal before September 4, 2025, may proceed. Assignment is a transfer of ownership. Dash has provided no authority that would bar public auction of assets assigned to the U.S. Marshal before the bankruptcy. The films, copyrights, and corporate entity interests that may be included in the public auction are those identified in Plaintiffs' letter dated September 29, 2025, at Dkt. 497.

Dockets.Justia.com

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: October 1, 2025
New York, New York

Copies transmitted this date to all counsel of record.

# Exhibit E

# BROWN & ROSEN LLC

### Attorneys At Law
100 State Street, Suite 900
Boston, MA 02109
617-728-9111 (T)
www.brownrosen.com

December 8, 2025

Hon. Robert Lehrburger
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

RE:    Webber, et al.  v. Dash, et al
       **DOCKET NO.** 1:19-cv-610-RWL

Dear Hon. Judge Lehrburger:

       This office is counsel to the Plaintiffs in this matter.  The US Marshal has signed a notice of sale relating to the assets of Poppington LLC.  The auction will be published in the NY Daily News and will occur on December 30, 2025.  Please see Exhibit 1.

       .

                              Sincerely,
                              Brown & Rosen LLC
                              By:  Christopher Brown
                                  Christopher L. Brown

Cc:  All parties via ECF

1

# EXHIBIT 1

# NOTICE OF SALE BY THE UNITED STATES MARSHAL

Pursuant to the initial Writ of Execution issued on July 28, 2022 by the United States District Court in the action Webber v. Dash, 19-Civ-610 (RWL) (S.D.N.Y.)("Lawsuit"), and other judgments and court orders received on behalf of various judgment creditors intervening in the Lawsuit against defendant judgment debtor, Poppington LLC which have been delivered to me as United States Marshal for the Southern District of New York ("Marshal"), the Marshal, or an authorized representative thereof, will sell at public auction, multiple audio/visual works/copyrights of Poppington LLC. Poppington LLC's major asset is ownership of a film entitled "Honor Up" which was executively produced by Kanye West and contains acting performances from "Cam'ron" "Damon Dash" "Stacy Dash" and others. A stipulation between the parties has been submitted to the Court authorizing the sale of the audio/visual works-United States Copyright Registrations of Poppington LLC, which will be sold as one group price, and the following works are the subject of the auction:

| Company | Title | Registration | Year |
|---|---|---|---|
| [ 1 ] Poppington, LLC | Honor Up & 1 other title; motion picture. | V9960D594 | 2018 |
| [ 2 ] Poppington, LLC | Too honorable & 1 other title; motion picture. | V9963D188 | 2017 |
| [ 3 ] Poppington, LLC | Too honorable; motion picture. | V9944D865 | 2017 |

1

| [4] | Poppington, LLC | Too honorable; motion picture. | V9944D864 | 2017 |
| [5] | Poppington, LLC | We Went To...China and 2 other titles. | V9962D993 | 2018 |
| [6] | Poppington, LLC | Welcome to Blackroc & 2 other titles; motion picture. | V9929D973 | 2015 |
| [7] | Poppington, LLC | Welcome to Blackroc & 2 other titles; ; motion picture. | V9929D974 | 2015 |
| [8] | Poppington, LLC | Welcome to Blackroc & 2 other titles; ; motion picture. | V9929D975 | 2015 |

All of the above copyrights/films have been assigned to the US Marshal free of any liens and encumbrances, however, the US Marshal only has two (2) of the copyrighted films in its possession, "Honor Up" and "Too Honorable".   The winning bidder may/will need to obtain copies of the other copyrighted works from the US Copyright Office. The public auction will occur on December 30, 2025, at 10:00am at the **Crowne Plaza HY36 Midtown Manhattan in the Hudson Room** located at 320 W. 36th Street, New York, NY 10018, and the interest of Poppington LLC will be sold. Please contact and register your appearance to attend via email to Christopher Brown, Esq., Brown & Rosen LLC, 100 State Street, Boston, MA 02109, at cbrown@brownrosen.com. This registration is necessary as the public auction will be filmed for airing for streaming purposes, digital or television distribution. By attending the public auction, all persons agree and consent to having their likeness, voice, image and appearance recorded and displayed by the judgment creditors.

The minimum bid shall be no less than Three Hundred Thousand Dollars ($300,000.00) by third party bidders. The judgment creditors, however, may credit bid from the amount of the judgment at the sale and are exempt from the minimum bid requirement. Only the judgment creditors can secure a winning bid that is below the minimum bid requirement by bidding a portion or all of the credit of the judgment(s). For bidding purposes, any potential purchaser must register with the Marshal the day of the auction to take part in the auction. Representatives of corporate and individual bidders are permitted to bid as authorized agents of a company or individual.

With the exception of the judgment creditors, a deposit equal to twenty percent (20%) of the minimum bid, totaling Sixty Thousand Dollars ($60,000.00) to purchase the audio/visual works/copyrights must be paid by the purchaser by certified or bank check made payable at the time and place of the sale to the "United States Marshal for the Southern District of New York" for which the United States Marshal or his representative will give a receipt, the day of the public auction. Prior to bidding, the certified funds shall be presented to the Marshal in order to obtain permission and a number to bid from the Marshal.

The balance of the funds to purchase the audio/visual works/copyrights must be paid by certified bank check made payable to the "United States Marshal for the Southern District of New York" and delivered to the U.S. Marshal at his office,

3

United States Courthouse, 500 Pearl Street, Fourth Floor, New York, NY 10006, within fourteen (14) days from date of the sale. After receipt of the purchase price, the United States Marshals Service will execute an assignment transferring ownership of the audio/visual works/copyrights to the purchaser. Failure to pay the balance of the funds to purchase the audio/visual works/copyrights within fourteen (14) days of the date of the sale, will result in forfeiture of the deposit to Josh Webber and Muddy Water Pictures.

Dated: December 8, 2025

Jhovanny Gomez

Acting United States Marshal for the
Southern District of New York

4